Alvarado and others I just forgot to ask you, you don't need a break, do you? Our counsel Reddy and Alvarado, we'll hear first from Mr. Garcia. Good morning, sir. Before the court is an appeal of Abnero Alvarado's conviction under 18 U.S.C. 111, wherein the defendant was found guilty of self-defense, Mr. Alvarado was found guilty of self-defense under Section 18, denying Mr. Alvarado a jury instruction of self-defense. Additionally, the district court erred by instructing the jury that the government need not prove beyond a reasonable doubt that Mr. Alvarado, the appellant of this case, knew that the federal agent was, in fact, a federal agent engaged in the course of his employment. Can I ask you a question about the self-defense? Yes, ma'am. And that is about what's in the record on this. The district court held that a rational jury couldn't conclude that either Pedro or Alnardo was in fear for his life. Now, what is the evidence about when the shot was fired that actually hit the agent? Well, Your Honor, we believe that that's a fact question of when the shot was fired. What is the evidence in the record? That's what I want to know because I've got notes that say that he felt the wound sometime in the three miles from the house to wherever the thing finally ended. Correct. And I can draw the court's attention specifically, Agent Harrison testified that he . . . He was the agent. Agent Harrison was the ICE agent, correct. He was the ICE agent who was shot. He testified that soon after turning off of the corner of 11th and 490, he starts to head up north. Right. And sometime after that, of course, the government's argument was that it happened after the altercation that occurred at the corner there of 11th Street, also known as Cemetery Road. However, there's a conflict in the testimony because we have Agent Reneau who testifies that . . . Agent Reneau testifies that there's no time, and this is at 1319, there was no time between shots fired and I'm hit. Shots fired and I'm hit, you know, that saying that . . . And Agent Harrison testifies that he had the radio in his hand and he immediately called out. Christopher . . . So he testified, Harrison, who was the one that got hit . . . Yes, Your Honor. . . . testified that he got hit somewhere on that three miles. Correct. Well, his testimony, Your Honor, if I may, is that he got hit further down, a little bit further down, somewhere between . . . And Agent Reneau testifies that he was struck less than a quarter mile north of 11th Street and the intersection of 493. So . . . Agent . . . I mean, the point is that he got hit after he left the scene, so to speak. The agent got hit after he left the scene. Well, Your Honor, the testimony is that the agent was hit. We don't believe that that, in fact, is what occurred. We believe that a reasonable jury could conclude that he was . . . That's what I want to know. What's the evidence? I mean, that's his evidence, okay, was that he was hit when he had left the scene of the . . . under the tree or whatever. Yes, Your Honor. The evidence is that, again, it's . . . The only evidence is that you have the statement of Agent Harrison saying that he was struck sometime after he left. Of course, Agent Harrison knows and is being . . . understands the concept of self-defense that if he's struck at the tree, or where that initial altercation where my client and his brother were shot at, then there's a valid claim of self-defense, but the further he gets away from that tree, then it makes it less likely that there is a self-defense claim. Again, we go back to what Agent Harrison testifies. He testifies that he immediately called out on the radio. His immediate call out on the radio was not that shots fired, but rather it was shots fired, I'm hit. And that not only is it . . . is it stated by Agent Reneau, but also Agent Chris Villarreal that's at . . . Chris Villarreal at 2068 hears Harrison break radio silence and say, shots fired, shots fired, I'm hit. And if that's the first call he makes out where Agent Harrison says that he has the radio in his hand, immediately, there's no time from the time that, you know, that it happened further away from this initial altercation. Did they say they heard the shots fired and then he radioed, or did . . . he's saying at the same time shots fired, shots fired, I'm hit. Did they hear the shots and then he comes on the radio, or they're just relying on what he said? They're just relying on what he said. They never heard the shot. Well, that doesn't mean that he radioed as soon as shots were fired, necessarily. Well, Agent Harrison testifies that he radioed as soon as shots were fired. The first thing he did, he testifies that he has the radio in his hand and that he radios out immediately, shots fired, shots fired, I'm hit. And so that's the point, that the only evidence we have is this, is this circumstantial evidence that he's, when he's saying that he's hit. Now at trial he testifies that he felt a bullet strike him somewhere further down. I think it also raises a, potentially could raise an issue as to, you know, again, they're convicted under 111, and there's no requirement that he be, that he be struck by a bullet. You know, did the jury decide that, well, they, half of them maybe decided that he was assaulted at the tree, but then others decided that he was assaulted when he was struck? There's no requirement that he be, that he be struck by a bullet. And so the issue, I think, the further you get away from, and the testimony also from my client and his brother is that they were firing in the air. You have the added ingredient of another assailant or a group of other assailants in another vehicle also chasing him, where Agent Harrison testifies that they, that they were, that he was being shot at by both sides, by both sides, that there was two vehicles that were following him, that the vehicles were spread apart at 1502. He state, he testifies to that. What's the total body of evidence that you rely upon for the inference that your people could have acted in self-defense? Yes, Your Honor. If I may, Arnoldo Alvarado at 2099 is awoken by his father that there are armed people on the property or home, or invaders on the property, again, taking into account his testimony that they had previously witnessed their mother being shot at or, or, or a weapon being shot. I didn't really intend for you to go back that far, but I've got it. Okay. Well, again, this is, this is what's going on in that young man's mind, and he testifies to it. It's in the record. Additionally, uh. Your mother was home, safely in the house, right? Yes, ma'am. He was all, the whole family was in the house. The entire family. They pick up their guns, get in the truck, and head out hunting for people. No, Your Honor. They go out to investigate trespassers that were on their property, and as they arrived at, to the trespassers. The trespassers, they get their guns, get in the truck. As. Nobody's being shot at in the house. Nobody, the mother's not outside like she was. The house was empty. I'm sorry? The house was empty. The house was empty, correct. They go out to investigate. They come at the house where the, when they, they were all asleep. They're rightfully on, on their property when. Every, mother, everybody's accounted for, their mother isn't out on the property like the previous. Correct. So they leave the safety of the home, get their guns, get in the truck, head out. On their property, yes. And as they reach where the trespasser is sitting under a tree, they're fired upon. That's statement from both Arnoldo and Marquez Alvarado, stating that they were fired on first. You have. How did they know they were, did they say how they knew they were fired upon? Was it noise, or was it bullets? They heard the gunshots. They heard, they heard the shots. They heard the shots at 2111, Arnoldo Alvarado, you first heard the shots fired at them. And that's when he picked up his gun. At 2115, again, at three in the morning, there's an unmarked vehicle sitting on their property. They hear shots fired when their father told them that they have these people that are there to cause harm when they previously had this issue come up. As they approach the vehicle, they hear shots fired. You have Rene Garcia, David Olivares in the other vehicle. David Olivares had testified earlier that they had an AK-47 and another handgun in that were shooting in that direction, that could have been shooting in that direction. Again, we believe it was error for the court to make a factual determination rather than instructing the jury. On cases, on cases, you know, the government cites to the Branch case, wherein federal agents had warrants to be at the Branch Davidian compound, and the district court gave them a self-defense instruction, and I, you know . . . But do we consider the conduct, the fact that they did chase this officer up FM, was it 493? I mean, is that part of the whole circumstances? At that point, they were not being fired on, were they? Your Honor, respectfully, I believe it is a circumstance, but I believe that's a jury . . . They were not returning fire. They were chasing and firing, and I think your brief says to get rid of these people once and for all. And the jury is instructed to make that decision of whether the force was excessive, but rather than allow the jury to make that determination, one person made that choice, made that decision. I'm just asking, assuming that Officer Harris was shot near the tree, do we cut off our review after that in terms of . . . or do we consider what the Alvarado's did after that in continuing pursuit of the officer? Your Honor, if I may, respectfully, I think the determination can be made based on the the shots that he fired were in the air, and you have the added ingredient of Garcia and Olivares following in the F-350 that arguably were firing as well. Again, you have somewhere . . . Mr. Garcia, you've exceeded your time. You can have some time. Thank you, Your Honor. No, you don't. Thank you, Your Honor. I didn't reserve you. Mr. Sullivan? Yes. Good morning, Your Honors. My name is Scott Sullivan. I represent Pedro Alvarado. I'm the father of the co-defendant. From the questions I already heard, it's obvious that there is a concern as there was with the trial judge that the further he gets down that road, the further he continues to However, the government . . . not us . . . the government says they disagree with that with a very important observation, and that observation is that in self-defense claims, you have to look at the totality of the circumstances. I say this because the trial judge on almost four occasions would lay out three elements. He would say, Officer was in flight. The officer was still being shot at. The officer was unarmed, and he was trying to get away. From the trial judge's perspective, that was the end of it because he even made a distinction that he was going to carve out what had happened back at the tree when they initially approached the car. He was going to carve it out of the facts. How he would do that, I'm not quite sure, but he was going to carve it out and say there may have been self-defense there, but he made it abundantly clear, based on the same grounds I'm hearing this court ask, that because of those handful of elements, he would not give him self-defense. But when you step back and look at the totality of the circumstances, you first of all have to look at Hargill, Texas. Hargill, Texas is so bad that it has drug dealers setting up drug dealers. They call the cops on each other. They both have cops on the payroll. Cops live in Hargill that are corrupt. The whole town is so dangerous that everybody knows the town motto, and that is, it's going to be my drugs or nobody's drugs. Where is this place? It is down in the valley northeast of McAllen. It would be starting to come, as you start to come, I believe, north of, out of the valley a little bit. In the valley, the towns line up linearly, from Brownsville all the way to Rio Grande City. In this brief, United States v. Posada Rios, which is a case from our court, it talks about the elements of self-defense, and one of them is, according to this decision, which you all didn't cite, the defendant had no reasonable legal alternative to violating, to shooting, and a chance to refuse to do the criminal act. Now, weren't there legal alternatives here than grabbing the guns, getting in the truck, and getting in a shootout, and then continuing to pursue? In a typical place, in a typical town, that would be true. Since when did we carve Brownsville out of the state of Texas? I know that, I'm aware my initial comment sounds rather strange, and I'm not saying in certain places, in certain places, you change the definition of self-defense. But the point is, they had, even though, yes, he does, as I think the evidence starts to show, he got shot after he started to move, respectfully, Judge Olin, I mean Judge King and Judge Olin, excuse me. He did get shot after that. Is it clear he was in his vehicle, and the vehicle was moving when he was shot? I believe that you had, at least certainly the trial judge, had ample evidence to conclude that, and that's what led him not to give the charge. This is what gave rise to this split charge idea, that since there may have been some gunshot at the car, this continuing to chase after him and keep shooting at him could not be self-defense. Now, how he would have carved that out, I don't know. He never described how he was going to do that. Your Honor, you cited a case a minute ago. What was the name of that? I apologize. The United States v. Posado Rios. It's cited in one of the government's briefs on page 17. Yes. Okay. And one of the things, one of the end quotes in that case is a concept, rather the concept that just ended my argument, but if I could briefly finish the sentence, is that jurors, we don't want to confuse them with self-defense charge. We would submit to the court that we periodically ask jurors to think about one issue when it comes to a piece of evidence, then forget that evidence, for instance, a 404B situation. The evidence comes in. We tell them to consider it as it goes to intent. We then turn right around and say, don't consider it for anything else. Mr. Garcia. Thank you, Your Honor. I'm done. You have five minutes on the rebuttal. Mr. Kim. May it please the Court. My name is Paul Kim. I represent the United States in these consolidated appeals. It is my honor to present this panel with my very first oral argument. Unless this panel has questions or concerns about the other issues, I will confine my presentation to the panel. The first issue is the self-defense jury instruction issue. The district court did not abuse its discretion in this case by refusing to instruct the jury as to self-defense because the defendants did not make the requisite showing. As counsel stated, this court must look at the totality of the circumstances and as Your Honors are aware, the background facts led these two groups to focus on the same tractor trailer in Hargle, Texas. The agent, Agent Harrison, was parked at an intersection near a tree. The leader of the group of drug dealers, Rene Garcia, called Pedro Alvarado and Pedro Alvarado then woke up his children, Arnaldo and Marquez, told them to get their guns, get in the truck and because he had had a report that there were armed people in the area and one of them was parked near their aunt's property. Now at this point, they have a report of a threat. That threat is not imminence, that threat is not to their property, it is to a neighboring property. Well, it's still family property. It was the aunt's property. Yes, but it was still not their property and it was the aunt's abandoned property and both sons testified that the aunt and nobody else was living there. Marquez described it as abandoned with no electricity. So at this point, they could have stayed in the safety of their home, they could have called the authorities, but instead they chose to leave their home and go towards the perceived threat. So the Alvarados live on a fenced property with a locked gate. They leave that property and travel a quarter of a mile down the road towards the aunt's property. They have their headlights off. They are slowly driving towards the allegedly armed person and Agent Harrison, who is sitting in his car, sees the Alvarados coming towards his vehicle and he decides to leave and he begins to leave. At this point, the Alvarados allegedly and conveniently hear gunshots and then proceed to open fire on Agent Harrison's Jeep. Now these gunshots, the Alvarados claim, constituted a threat justifying their acts as self-defense. The problem with that is that they themselves admit that they do not know the actual source of these gunshots. They assume that it was the Jeep because the Jeep was in front of them, but Rene Garcia's pickup truck was actually in the area, in the vicinity, coming towards their location. They did not see muzzle flashes coming from the Jeep. So they simply assumed that it was coming from the Jeep and they fired at the Jeep. The only evidence of these gunshots comes from the son's testimonies, which is contradicted by Agent Harrison's testimony, as well as co-defendant David Olivares' testimony. He was a passenger in Rene Garcia's pickup truck at the time. They then, once the shooting starts, well, I'm sorry, let me stop there. So at this point, under FIOLA, there must be a reasonable, the acts of the victim, the must be reasonably interpreted as an unlawful use of force for the FIOLA exception to apply. At this point, the officer, Agent Harrison, has taken no acts other than to start driving away. He is unarmed. He could not have fired those shots. I don't know that. That's true, Your Honor. But what they do know is they heard gunshots and they don't know that it actually came from the Jeep. But, so there is no reasonable basis for them to simply just assume that it came from the Jeep. However, the events proceed once the shooting starts. What is, in the light, in the evidence most favorable to the Alvaredo's, when could Officer Harrison have been shot under the evidence? Well, it is the government's contention that... Well, I believe that, based on their testimonies, once they heard the gunshots is when they claimed to have been in fear of their lives. So, I mean, they sort of had a general fear beforehand, but when they were approaching the vehicle, Arnoldo was not holding the gun. He had a gun with him, but he was not holding it. That seems to indicate that he was not in... No, I'm asking when is the evidence say the first possible time that Harrison was hit by a bullet? Oh, I see. I'm sorry. The only evidence of when Agent Harrison was actually hit is Agent Harrison's testimony. The Alvaredo's did not testify as to when he was hit because they don't know. Basically, nobody else knows except Agent Harrison. And Agent Harrison's, so Agent Harrison's uncontested testimony is that he was approaching the blinking light, which is at the intersection in front of the convenience store. And that's three miles away from... It's not three miles away, but it is... The entire chase was approximately three miles, and the convenience store was at least one intersection up. All right. That was my... I had that written down. How far was the convenience store from the tree? It looked to be about a quarter of a mile. I don't know that anybody actually testified as to the specific distance. In the government's trial exhibits, there is an overview map of Hargill, and I believe Exhibit 6 shows the convenience store intersection. He was hit before he got there? Yes. He claimed to have been looking at the blinking light, and as he was passing underneath the light, he felt the bullet go through him. So he was definitely off the Ann's property, and he was passing in front of the convenience store. What about their argument that he radioed in, shots fired, I'm hit? I'm sorry? What about their argument that he radioed, shots fired, I'm hit? Well, their argument regarding the radio communications is based on the testimony of two officers, one of whom was not in radio communication distance. He was on his way in, and he... was that I'm hit, but he did not hear any of the preceding communications before that. The second officer testified as to, he basically summarized the entire communication, radio communications that he received from Harrison as shots fired, shots fired, I'm hit. He was not asked, he was called as a defense witness, but he was not asked exactly which communication came when during that entire sequence. So that was essentially his summary of that entire series of communications. So it is the government's contention that those do not show when Agent Harrison was hit. Basically, the only evidence is Agent Harrison's testimony. And in the appellant's brief, in Arnoldo's briefs on page eight, he states that Agent In his reply brief, Pedro Alvarado states that, admits that Agent Harrison was shot during the chase. So I think that that issue is essentially uncontested. So during the chase, as held by the district court, there simply was no threat posed by Agent Harrison. It's uncontested that he was in retreat the entire time. He never fired any shots. He was unarmed, so he could not fire any shots. And the defendants did not claim to see any gunshots coming from his Jeep. But they proceeded to chase him for approximately three miles with Rene Garcia coordinating the chase. And the uncontested fact is that Agent Harrison was shot during the chase. Now, since the assault, the defendant's acts constituted assault either at the initial encounter at the tree or during the chase, the district court did not find it necessary to definitively determine whether or not the defendants had a reasonable basis for self-defense at the tree, because it held that even if we were to assume that they had self-defense at the tree, there was absolutely no evidence of self-defense during the chase. And therefore, it refused to instruct the jury as to self-defense. So the district court's ruling was not an abuse of discretion and may be affirmed on that basis alone. However, it is the government's contention that the Alvarado's never had any reasonable basis for self-defense at any point during any of these events. If this court has no other questions, the government respectfully requests that the district court's judgment be affirmed. Thank you, Mr. Kennedy. Thank you. Mr. Sullivan, you have five minutes on rebuttal. Thank you. I forgot probably our most important piece of evidence. The trial judge said at least on one occasion, I believe on a second occasion, as he heard this evidence and as he heard it toward the end, he said this was, quote, a close call. And that's because he himself knew that most or perhaps all of the physical evidence pointed back that this happened back at the tree, despite the officer's testimony that he believed it happened further down the road. We say this because when Quantico came in, let me back up and change that, when the FBI brings in their experts to check this road out, there are no shells, quote, laying out constantly down the road. They are only at specific spots, and almost the great number of them were backed up by the tree. So that's where most of the shooting took place, most of the altercation. Incidentally— Your client's client— I'm sorry? Your client was coming towards the jeep? When he comes— I mean, when the whole thing started, when the jeep was under the tree. When the jeep was under the tree, his car was starting to approach him and coming down the road. The officer then flips on his lights and tries to head out and onto the road. He looks the other way, and the real drug dealer that started this whole problem is coming the other way. And he says, I got shot at from both angles by the Alvarados, who are actually victims of this real drug dealer who can play every game in the book. He called 911 and said, there's a shooting going on out here, about 10 minutes before the shooting even started. Welcome to Hargill, Texas. It was reasonable for them to chase him because of all the—not only the past events, they had been the victims of a home invasion. Not only because of that, but because of the way the shooting had started at the tree. Yes, fleeing is an element, under the totality and circumstances test, that the government can point to. But it doesn't remove the fact that all it takes is one turn of the wheel, and this person who is being shot at is coming back the other way. Now he's the deadly weapon. I would also note this. The judge put a lot of emphasis on the fact that he believed all the evidence that was introduced over those four days. It seemed to him that the agent was not armed. That still remains that issue. It was never really completely solved. They did several grid searches of that area. They never found a gun, but there still remained the possibility because of some of the testimony. By the way, these witnesses were very young. Some were 18 and 16 years old, testified. They clearly heard shots coming from that area, from where the agent's truck was at—excuse me—so just to say he kept on chasing doesn't say— Did they stop their truck when shots were fired or did they keep going towards the jeep? They kept going—I'm sorry, yes, they kept after the jeep until he landed in some brush, and then it even gets more confusing because it's not clear at what distance they stay away from him and stay away from the scene because the agent abandons the vehicle— No, I meant after he's at the tree, they think he's shooting at them, they don't stop. They continue going towards the jeep after they think the jeep has been shooting at them. I'm sorry. I believe momentarily there was at least a stop because they were coming up on him from one end, and they had to stop or they would have rammed each other because he has to turn the other way and starts to run into the other drug dealer, and then the agent has to do a complete U-turn to begin his getaway, so to speak. So there is a point where you have all three of the vehicles almost practically stopped because the officer is doing a U-turn in the middle of this to get away from all of this. I notice my time is up. I thank the court. People think criminal defense lawyers are not pro-law enforcement. We are very, very fortunate that this officer didn't die, that he lived. Thank you very much. Mr. Sullivan, you and Mr. Garcia are court-appointed to represent the Alvarados, and the court thanks you for the opportunity today. Thank you very much. Mr. Kim, did you say this was your first argument? Well, you did a very good job, too. Thank you very much. Report to your boss that you did great. Okay. We'll call the next case, if y'all are ready.